# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                            Case No. 14-CR-201

JAMAAL R. EDWARDS,

     Defendant.

---

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

On October 28, 2014, a grand jury sitting in the Eastern District of Wisconsin returned a three count indictment against defendant Jamaal R. Edwards ("Edwards"). The indictment charges Edwards with possession of a firearm as a previously convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession of an unregistered sawed-off shotgun, in violation of 26 U.S.C. §§ 5861(d) and 5871; and possession with intent to distribute a mixture and substance containing heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Edwards was arraigned on the charges and entered a plea of not guilty. Jury trial before the Honorable Lynn Adelman is adjourned pending resolution of pretrial motions.

Before the court is Edwards' motion to suppress evidence seized following a search of Edwards' home. Edwards argues that City of Milwaukee police officers entered his residence and seized evidence without consent and without legal justification. I conducted an evidentiary hearing on Edwards' motion and heard oral argument on the motion. For the reasons that follow, I recommend that the defendant's motion to suppress be denied.

**FACTS**

While investigating a homicide that occurred on August 18, 2014 near North 47th Street and West Center Street, Milwaukee police learned that the shooter may have headed down the block and run into a residence. Ultimately, this led the police down the block to 2762 North 47th Street. The facts of this motion arise from that event. The following witnesses testified at the evidentiary hearing: Detective Todd Fischer, Officer Michael Wawrzyniakowski, and Sergeant Daniel Wesolowski of the Milwaukee Police Department ("MPD"); Talana Johnson; and Dave Reel.

    *1.    Detective Todd Fischer*

Detective Todd Fischer ("Fischer"), who has been employed with the City of Milwaukee for 23 years, testified that he was on duty on August 18, 2014 when he was asked by two MPD captains to take the lead in a homicide investigation. (Transcript of Jan. 9, 2014 Evidentiary Hearing ("Tr.") at 7-8, Docket # 21.) Fischer was called to the area of North 47th Street and West Center Street. (Tr. 40.) Upon his arrival at that location, Fischer observed a car that had crossed over to the opposite side of the street and a deceased individual lying on the ground outside of the car. (Tr. 8.) Fischer described the scene as "extremely chaotic," noting that the victim was well-known to the neighborhood. (*Id.*) Because the victim was well-known to the neighborhood and because Fischer was the "detective responsible for the area" and was thus known to the residents, Fischer testified that people "immediately became more cooperative with the police and wanted to tell me what was going on." (Tr. 9.) Fischer was told by the MPD captain that the shooters had run down the street and were now at a house up the street. (*Id.*) The initial information Fischer received was that there were two individuals responsible for the shooting. (Tr. 9-10.) Fischer

2

was told that the shooter was thinner-set and wearing all red and that he was accompanied by a heavier-set individual. (*Id.*) Fischer received this information through an anonymous call to his cell phone. (Tr. 41-42.)

After receiving this anonymous call, Fischer sent an officer to go down the street in the direction the witnesses saw the two alleged suspects run and look for people matching the suspects' descriptions. (Tr. 40, 43-44.) No specific address was given by the caller. (Tr. 48.) However, Fischer later learned from the officer that the two suspects went to 2762 North 47th Street. (*Id.*)

Fischer learned that there was a security camera from a nearby merchant's store pointing directly at the location where the victim was shot. (Tr. 12.) Fischer watched the surveillance footage and saw Edwards moving in a southward direction on the east side of the street. (Tr. 16.) Edwards was with the man wearing red, who was later determined to be Dave Reel. (*Id.*) Fischer saw Edwards and Reel walk past a car, stop momentarily, and then Edwards went into the store. (*Id.*) Reel stood on the corner. (*Id.*) Edwards left the store after purchasing a can of soda and met up with Reel. (*Id.*) Edwards and Reel walked back past the car and as they were walking past the car, a man opened the window, then opened the car door, and had a brief conversation with them. (Tr. 17.) Fischer stated that the conversation appeared to last "only moments." (*Id.*) Approximately two seconds after Edwards and Reel depart from the car, Fischer saw the assailant come from the west and shoot point blank at the man in the car. (Tr. 17-18.) At the time the assailant approached the victim, Edwards and Reel were within three feet of the car. (Tr. 46.) Edwards and Reel continued walking down the sidewalk. (Tr. 17.) At this point, Edwards and Reel leave the surveillance footage. (Tr. 18.)

Fischer testified that at the end of the surveillance video, Edwards and Reel were traveling northbound and the shooter was traveling eastbound. (Tr. 48.) Upon arriving at 2762 North 47th Street (which was nine houses due north of where the homicide occurred), Fischer saw that both Edwards and Reel were being detained by officers. (Tr. 11, 14.) However, having seen the assailant on the surveillance footage, Fischer knew that neither Edwards nor Reel were the shooter. (Tr. 12-13.) Edwards and Reel were initially sitting inside of a truck, and Fischer had them leave the vehicle and spoke to them in front of the residence. (Tr. 13.) Fischer stated that he asked Edwards and Reel why witnesses were saying that they were the shooters when he "kn[ew] for a fact" that they were not the shooters and asked whether they were assisting the shooters in some way. (Tr. 13-14.) Fischer testified that Edwards stated that he did not know what Fischer was talking about. (Tr. 14.) Fischer, having seen Edwards on the security footage, told Edwards that they were looking for the shooter. (Tr. 15.) Fischer asked Edwards if there was anybody else in the house. (Tr. 18.) At that point, Talana Johnson stated "'My babies are in the house. Get my babies out of the house.'" (Tr. 18, 21.) Fischer testified that he knew Johnson was Edwards' girlfriend and that at least some of the children in question were Edwards' and Johnson's. (Tr. 21-22.) Fischer testified that he asked her: "I need to go in and get the babies out, can I get your consent to go into your house?" (Tr. 20.)

Fischer stated that he asked an officer to get a consent form for Johnson to sign; however, the officer never returned with the form. (Tr. 20-21.) At that point, Fischer testified that he asked Johnson if he could "send [his] Tac Unit in to get the kids out" and that she responded, "Yes, get my children out of the house." (Tr. 21.) Fischer testified that after receiving permission from Johnson to retrieve her children, he directed other officers

and the Tac Unit to go into the house to get the children out and to check to make sure the shooter was not in the house. (Tr. 22.) Fischer stated that he had explained to Johnson that neighbors had told him that the shooter ran into her residence. (*Id.*) He testified that her response to that was "[m]y children are in that house, could you please get my children out." (Tr. 23.) Fischer overheard Johnson being asked whether she knew if anyone else besides her children were in the house, to which Johnson responded that the only people that were supposed to be in her house were her children. (*Id.*)

Fischer testified that Edwards was present the whole time and was not agreeing or disagreeing with anything Johnson said. (*Id.*) Fischer explained that 2762 North 47th Street was a duplex and Johnson told him that she lived in the upper unit and that the door on the left of the building entered into her apartment. (Tr. 24.) Fischer testified that he directed officers to enter the premises through that door. (*Id.*) Fischer stated that when the officers were going in after Johnson gave her permission, Edwards said "wait, wait, wait, wait." (Tr. 25.) Fischer understood that Edwards wanted more information about what the officers were going to do and he explained to Edwards that "he had nothing to worry about" and that he was going in to look for the shooter and retrieve the children like Johnson asked. (*Id.*) Fischer testified that he meant Edwards had "nothing to worry about" because he knew Edwards was not the shooter and he conveyed this to Edwards. (*Id.*) However, Fischer was not certain as to whether Edwards had any knowledge or affiliation with the shooter. (*Id.*)

After Edwards told Fischer to wait, Fischer testified that they did not wait. (Tr. 26.) Although it was standard protocol to get a signed consent form, Fischer testified that he believed he had Johnson's consent and that even so, the officers "weren't necessarily waiting for [consent]" because there was a sense of urgency because the children were

potentially in the house with the shooter. (*Id.*) Fischer testified that Officer Michael Wawrzyniakowski was assisting and while standing on the porch, asked Fischer whether they had consent to go in the house. (Tr. 28.) Fischer stated that he looked back at Johnson and Edwards and neither expressed disapproval, so the officers entered the house. (*Id.*)

After the officers entered the house, Fischer proceeded to interview Edwards, Johnson, and other potential witnesses inside a police vehicle. (Tr. 29.) Fischer testified that Edwards continued to deny having been at the scene of the shooting. (*Id.*) Fischer confronted Edwards with the fact that he saw him on the video and explained that he was going to take him to the station because he was obviously lying. (Tr. 33-34.) Another officer transported Edwards to the station and Fischer stayed at the scene. (Tr. 34-35.) Fischer stated that he spoke briefly with Edwards again at the police station after the homicide detectives were done speaking with him, and Edwards apologized for lying. (Tr. 38.) Fischer had no further contact with Edwards after that brief conversation. (Tr. 39.)

Fischer testified that there was a sense of urgency about this situation because he had received reports that additional shots had been fired in the immediate vicinity, he was receiving additional reports that Edwards and Reel were the shooters, there were escalating emotions with the neighbors (Tr. 37), the shooting occurred in close proximity to where the officers were located, and no one had seen where the actual shooter went (Tr. 31-32). Thus, Fischer assumed the shooter was in the house. (Tr. 32.) Fischer stated that he determined from the surveillance video that the shooter went back in the same direction he had come from; however, Fischer knew that this direction led to an alley that led to Edwards' house. (*Id.*)

2.    *Officer Michael Wawrzyniakowski*

Officer Michael Wawrzyniakowski ("Wawrzyniakowski") has been a police officer for approximately 18 years. (Tr. 77.) Wawrzyniakowski testified that on August 18, 2014, they received a call for a shooting that occurred on 47th Street and Center Street. (*Id.*) Upon arriving at the scene of the shooting, Wawrzyniakowski saw the Milwaukee Fire Department attending to the victim, who had a gunshot wound to the head. (Tr. 78.) Wawrzyniakowski stated that the victim was known to the area and people were trying to see what was happening, so Wawrzyniakowski was tasked with conducting scene security, meaning setting up crime scene tape and getting people out of the perimeter. (*Id.*)

Wawrzyniakowski learned from Fischer that there were statements made by citizen witnesses that the possible person involved in the homicide had gone to 2762 North 47th Street. (Tr. 79.) Wawrzyniakowski went to the residence to provide assistance. (*Id.*) Wawrzyniakowski testified that he first saw Edwards on the front lawn of the residence. (Tr. 83.) Wawrzyniakowski testified that he had contact with Johnson, who stated that her "babies [were] upstairs." (Tr. 81.) Wawrzyniakowski further testified that the events unfolded very quickly and that there was "exigency here to make sure that these children are safe and there's nobody else up there with these children." (*Id.*) He testified that the scene between the shooting and the 47th Street residence was chaotic. (Tr. 82.) Wawrzyniakowski stated that "[e]verybody was out" on this warm summer day. (*Id.*) He said that there were other reports of shots being fired and "everything was happening. It was chaotic." (*Id.*)

Additionally, Wawrzyniakowski testified that he asked Johnson directly if the officers had consent to go into her house and that she responded by saying, "Yes, my kids are in there." (Tr. 120.) Wawrzyniakowski stated that he heard Johnson express concern for

her children multiple times prior to the officers entering the residence. (*Id.*) Wawrzyniakowski testified that he made no effort to obtain Johnson's written consent to enter the residence (Tr. 121) and stated that "it wasn't so much about consent" and it was the exigency of the situation (Tr. 119). Wawrzyniakowski stated that:

> [W]hen you don't know what's going on and you got a guy that's laying on the street with his face blown off, you have to make decisions. And we knew that somebody had gone into that residence, we had witnesses that saw them go into the residence, and we knew that there was [sic] children inside of that residence. So that's why we didn't get a search warrant.

(Tr. 125.)

### 3. *Sergeant Daniel Wesolowski*

Sergeant Daniel Wesolowski ("Wesolowski") has been a Sergeant with the MPD for 28 years. (Tr. 128.) On August 18, 2014, Wesolowski was assigned to the dayshift Tactical Enforcement Unit. (*Id.*) Wesolowski was called to the area of 2762 North 47th Street because of a police radio call of a shooting. (*Id.*) The report Wesolowski received was that a man had been shot in a motor vehicle, that it appeared to be a homicide, and that the suspects were on foot nearby somewhere. (Tr. 128-29.) About the time Wesolowski arrived on scene, members of the Tactical Enforcement Unit began hearing radio calls of a possibility that the suspects had fled into a duplex in the 2700 block of North 47th Street. (Tr. 129.) Wesolowski went to that address and saw officers outside of the house, on the side of the house, in the backyard, and in front of the house. (*Id.*) He also testified that it was a very warm summer day and that there were a lot of citizens in the area. (*Id.*) Wesolowski was told by "personnel that [he is] responsible for" that there was a possibility that the suspect might be in the upper unit of the duplex. (*Id.*)

Before entering the duplex, Wesolowski testified that he saw Wawrzyniakowski and other officers speaking to a woman who was saying "my kids are up in that house." (Tr. 130.) He testified that she had a sense of urgency to her voice that her kids were up there where this guy might be. (*Id.*) Wesolowski also saw Fischer conversing with the woman. (Tr. 131.) After hearing the woman's statement that "my babies are up there," Wesolowski testified that he started thinking, "we gotta move, we gotta get in there and check on these kids," because they could be in the residence with a gunman. (*Id.*) Wesolowski testified that he felt there were exigent circumstances allowing entry into the residence, specifically: the homicide, the radio traffic that a gunman was still in the area and might be in the residence, and the woman's statement that her "babies" were in the residence. (Tr. 133-34.) Because he felt that exigent circumstances existed to enter the residence, Wesolowski stated that he was "not going to try to get consent." (Tr. 134.)

### 4. Talana Johnson

Talana Johnson ("Johnson") testified that although she and Edwards are not formally married, she considered herself to be in a marital relationship with him. (Transcript of Jan. 30, 2014 Evidentiary Hearing ("Tr.") at 158, Docket # 22.) Johnson and Edwards have been together almost five years and have two children together, ages one and two. (Tr. 159.) Johnson testified that on August 18, 2014, she resided with Edwards at 2762 North 47th Street. (*Id.*) Johnson stated that she recalled Edwards coming into the house on that day and telling her that a young man had been shot and killed on the corner. (Tr. 160.) Johnson stated that Edwards was panicked, shaky, and scared when he told her about the shooting. (Tr. 161.) Edwards was with his friend Dave at the time and both Edwards and his friend came into the house. (*Id.*)

Johnson stated that Edwards and his friend Dave were upstairs for about five minutes and that all three of them went on to the top porch and were looking outside. (Tr. 162.) Johnson testified that Edwards and his friend went outside and she remained in the house, but soon joined them outside. (*Id.*) Johnson stated that her two young children remained in the house with her twelve year old daughter. (Tr. 163.) Johnson testified that when she, Edwards, and Dave went outside, there was a commotion and all of the neighbors were outside talking about the shooting. (Tr. 160-61.) Johnson stated that the police had the corner taped off and that officers began canvassing the block. (Tr. 162.) An officer began asking for everyone's name and contact information and Johnson gave the officer this information. (Tr. 162, 164.)

At this point Johnson went back in the house and Edwards and his friend Dave were still outside. (Tr. 164.) Johnson looked out the widow three minutes later and saw the police patting Dave down, so Johnson went back down the stairs. (*Id.*) When Johnson went back outside, she saw two officers grab Edwards and try to pat him down. (*Id.*) Both Johnson and Edwards were asking the officers what was going on and no one answered. (Tr. 164-65.) Johnson testified that the officers did not respond to her, but she heard the officers talking amongst themselves that they needed to pat down anyone leaving the house. (Tr. 165.) Johnson stated that at this point Edwards was put into a police car. (*Id.*)

Johnson testified that she again asked an officer what was going on and he responded that he did not know. (*Id.*) Johnson stated that she told the officer that she was going back in the house with her kids and the officer told her that she could not go back in the house. (*Id.*) When she asked why, Johnson was told that a gunman ran into her house. (*Id.*) Johnson testified that she told the officer that there was no gunman in her house and

that no one was in her house except for her three children. (*Id.*) She further testified that the officer asked her if they could go in and check and she told him no. (*Id.*) Johnson also testified that she told an officer that she was going back into the house to get her children and the officer responded that they had to go in the house to get them. (Tr. 166.) Johnson said she told the officer no, because her children had never seen police officers before and there was no reason for the officers to go in there. (*Id.*)

Johnson testified that the officer told her that she could either give them permission to go in or they could get a search warrant, to which Johnson responded that they would have to get a search warrant because she did not feel comfortable with the officers retrieving her children because they would be scared. (Tr. 167.) Johnson stated that she went "back and forth" with the officer about retrieving the children and after she told him he would have to get a search warrant, he said okay and walked away. (Tr. 168.) As she was standing there, Johnson testified that the officer walked back up to her and asked her again if the officers could get her children and told her that there was no way that she could go in the house to get her kids, the police would have to get them. (*Id.*) Johnson said she again told him no, that she needed to get her children, and that she knew for a fact that there was no gunman upstairs because she had just come from upstairs. (*Id.*) Further, she had been standing outside of her house and saw no one run into her house. (*Id.*) Johnson also stated that her back door was locked. (Tr. 185.)

Johnson testified that there were two entrances to her residence, and the side entrance did not work very well. (Tr. 168-69.) She did not hear anyone inside of the house and the lower unit was vacant. (Tr. 169.) At this point, officers entered the residence. (*Id.*) Johnson testified that she only spoke to one officer regarding entering the residence, and he

was an African American officer. (Tr. 170.) Although Johnson saw this officer speak with a Caucasian male officer, she testified that she never spoke with him. (*Id.*) Johnson testified that after the officers entered her residence, she was in tears talking to the officer, asking why they were going into her house and saying that her babies were going to be scared. (Tr. 171.) She said the officer told her that the officers would bring her children down safe, and her children were brought outside after about five minutes. (*Id.*)

Johnson stated that Edwards was brought back out of the police car and the officers told them that they had found things in their house, including a rifle. (Tr. 172.) Johnson testified that they were told that if they gave the officers permission to take the rifle and dust it for prints, they would leave. (*Id.*) Johnson stated the officers told them that they knew it was not the gun the victim was shot with. (*Id.*) Johnson told the officers they could not take the rifle. (*Id.*) The officer asked again, and she again said no. (*Id.*) Johnson testified at this point Edwards was arrested in front of her children. (Tr. 174.)

Johnson then asked if she could go back into the house to retrieve some of her children's things, and an officer told her she could and accompanied her into the house. (Tr. 172.) However, once in the house, another officer told her that she could not go in or touch anything. (Tr. 172-73.) She was not allowed back in the residence for approximately 45 minutes. (Tr. 173.) Then, Johnson was allowed to retrieve a few things for her children, and she left the house. (*Id.*)

    5.    *Dave Reel*

Dave Reel ("Reel") testified that he was a long-time friend of Edwards. (Tr. 229.) On August 18, 2014, Reel and Edwards were at Edwards' house and then walked to the store. (*Id.*) Reel testified that Edwards went into the store and bought a Red Bull and Reel stayed

outside. (Tr. 238.) Then, Edwards had a conversation with the victim that lasted approximately ten minutes. (Tr. 241.) Reel testified that he never spoke with the victim. (Tr. 238.) Reel stated that the victim's car door was open. (Tr. 239.) After Edwards and Reel walked away from the victim's car, the assailant came out of the bushes, approached the vehicle, and began shooting. (*Id.*) After observing the shooting, Reel and Edwards ran from the scene (Tr. 241) and returned to Edwards' house and went inside of the house (Tr. 230). Reel testified that they were in shock and sat down for a minute and then went back outside into the front yard. (*Id.*) Reel's girlfriend pulled up in a vehicle with his children. (*Id.*) Then the police arrived at Edwards' residence and both Reel and Edwards spoke with the officers. (*Id.*) Reel testified that the officers also spoke to Johnson and spoke to both Reel and Johnson at the same time. (Tr. 231.) Reel stated that the officer that spoke to them was Asian or Caucasian. (*Id.*) Reel acknowledged that he initially told officers that they had not been to the store and that this was untrue. (Tr. 243.)

Reel testified that the officers told them they were looking for the person who had done the shooting and for the weapon that he used. (Tr. 232.) Reel told the officers that the shooter was not there. (*Id.*) Reel knew the shooter was not in Edwards' house because they had seen the shooter. (Tr. 233.) After leaving the scene, Reel did not see the shooter or anyone resembling the shooter in the area, though Reel had not seen the shooter's face. (Tr. 233-34.) While outside of Edwards' residence with Johnson, Reel did not hear an officer ask Johnson for consent to enter the residence. (Tr. 234.) Reel testified that it was not until Edwards was handcuffed that he heard the officers "trying to go in the house" and stated that Johnson "clearly said no" and "not without a search warrant." (Tr. 235-36.) Reel did not hear the officers ask Edwards for permission to enter the residence. (Tr. 237.)

**SUMMARY OF ARGUMENTS**

*1.     Defendant's Argument*

Edwards argues that the government has not put forth sufficient evidence to support a finding of consent to enter the residence. (Tr. 248.) Edwards argues that Fischer was the only witness to testify that he received Johnson's verbal consent to enter the residence and based upon the discrepancies between the other officers and Johnson, verbal consent was not given. (Tr. 249.) Edwards states that the other officers testified that entry was made not based on consent but based on some type of exigent circumstances. (*Id.*) However, Edwards argues that the law enforcement's belief that there was a shooter inside of the residence was not based on any reasonable evidence. (Tr. 250.) Specifically, Fischer testified that the shooter ran in a different direction than Edwards and Reel, who traveled northbound towards Edwards' residence. (Tr. 251.) There was no testimony regarding anyone identifying the shooter in the area of Edwards' residence or a description of the shooter other than what Fischer observed on the surveillance video. (*Id.*) Edwards argues this was not a case of hot pursuit, as the officers arrived at Edwards' address some 20 or 30 minutes after the shooting. (Tr. 252.)

Further, the officers did not make any independent observations of the home, of movement inside the home, of statements from neighbors, or receive any information of other people coming in and out of the residence. (*Id.*) Rather, the information the officers had from Johnson was that she had just been inside the home and no one else was in the home besides her children, who she wanted to be with. (*Id.*) Edwards argues that Johnson's request to the police was for her to go inside and retrieve her children so she could be with them, not for the police to go inside and rescue the children from a dangerous situation. (*Id.*)

Edwards also argues that there were no exigent circumstances for entering the residence. Edwards argues that the officers' beliefs need to be objectively reasonable, and other than a few statements to Fischer regarding the direction in which individuals ran, law enforcement had no information to believe that there was a shooter inside of that home. (Tr. 253.) Johnson said no one else was in the house. (*Id.*) No neighbors or any witnesses said they saw a third person go into the house. (*Id.*) There were no loud noises or disturbances coming from inside the house and the officers did not observe anything to lead them to believe that someone had gained entrance to the residence unlawfully and was threatening the children. (Tr. 254.)

2.      *The Government's Argument*

The government argues that the officers acted lawfully in entering the premises for several reasons. First, the officers had Johnson's consent to enter the premises. (Tr. 256.) The government argues that, after being told by law enforcement that the assailant had potentially entered the residence, Johnson's testimony that she wanted to be the one to go into the house to retrieve her children "flies in the face of reason." (*Id.*) Rather, the government argues that the officers' testimony that Johnson gave verbal consent is more credible. (Tr. 257.)

Second, the government argues that exigent circumstances in the form of hot pursuit and safety to the community warranted the entry. (*Id.*) The government argues that Reel's testimony that he and Edwards ran from the scene after observing the shooting was consistent with the witnesses' reports that they saw two people running towards Edwards' house. (Tr. 258.) Further, the testimony showed that even though the shooter is seen on the video going in an opposite direction from Reel and Edwards, he could still have entered the

residence coming from a different direction. (Tr. 259.) Thus, the officers were in hot pursuit of what they perceived to be the route of the assailant. (Tr. 260.) And although Fischer knew Edwards was not the shooter, the extent to which Edwards may have been involved in the shooting was unresolved. (Tr. 261.) The government further argues that there was an imminent threat of harm because the children were inside the residence with a possible assailant. (Tr. 261-62.)

Finally, the government argues that exigent circumstances in the form of preventing the destruction of evidence justified entry into the residence without a warrant. (Tr. 272.) Specifically, because Edwards was seen speaking to the victim moments before he was shot, it was reasonable for the officers to assume that the assailant was working in concert with Edwards and therefore evidence of the commission of the crime may have been inside the residence, and could have disappeared had the officers waited to get a warrant. (Tr. 272-73.)

## ANALYSIS

As stated above, Edwards argue that the officers' entry into 2762 North 47th Street was illegal because Johnson did not consent to the entry of the residence and there were no exigent circumstances to excuse the officers' warrantless entry.

*1.      Consent to Search*

The government argues that the entry into the residence was authorized by Johnson's consent. As I indicated at the hearing, the governing law is well-settled. It is well established that consent is an exception to the Fourth Amendment's warrant requirement. *United States v. Glasby*, 576 F.2d 734, 737 (7th Cir. 1978). Voluntary consent "'lifts'" the warrant requirement. *United States v. Stribling*, 94 F.3d 321, 324 (7th Cir. 1996) (quoting *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991)). Consent can be express or it may be

implied from the circumstances. *See, e.g.*, *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000). The government bears the burden of proving by a preponderance of the evidence that consent was voluntarily given. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). The parties do not dispute this governing law. Rather, in this case, the determination of whether the officers had consent to enter the residence presents a credibility contest.

The parties presented diametrically opposing testimony. Two officers testified that Johnson gave them consent to enter her residence. Specifically, Fischer testified that while he was talking to Edwards and asking him whether there was anybody in the house, Johnson, Edwards' girlfriend, interrupted and said that "My babies are in the house. Get my babies out of the house." (Tr. 18.) Fischer asked Johnson "I need to go in and get the babies out, can I get your consent to go into your house?" (Tr. 20.) Fischer then directed a uniformed police officer to go and get a consent form. (*Id.*) When that officer had not timely returned with the form, he informed Johnson: "You know, we're going to go and send my Tac Unit in to get the kids out, is that okay?" (Tr. 21.) Fischer testified that Johnson replied: "Yes, get my children out of the house."(*Id.*) Fischer testified that Johnson's exact words were: "My children are in there; are you going to do something about it?" (Tr. 58.) Fischer then directed the Tac Unit to go into the house to get the children and make sure that the shooter was not in the house. (Tr. 22.) Fischer testified that he had explained to Johnson that neighbors were saying that the shooter ran into her house. Johnson replied that "[m]y children are in that house, could you please get my children out." (Tr. 23.)

Wawrzyniakowski testified that he learned that witnesses were saying that the person that was involved in the homicide had gone into 2762 North 47th Street and that there was a call for backup at that address. (Tr. 79.) Consequently, he reported to the 47th Street

residence. (*Id.*) At some point, Johnson came up to the scene and was stating that her babies were inside the residence. (Tr. 79-80.) Wawrzyniakowski explained that based on Johnson's repeated statements, he concluded that there was an urgency to make sure that the children were safe and that there was nobody else up there with the children. (Tr. 80.) Wawrzyniakowski further testified that he was not so focused on the consent but on the safety of the children. So, from the porch of the residence, he asked Johnson, "Is this your house?" She answered "Yes." He then asked "Your kids are up there?" Johnson answered "Yes." Finally, he asked "Can we go up there?" Johnson answered "Yes." (Tr. 81.) He testified that this exchange happened very fast. (*Id.*) Fischer and Wawrzyniakowski's testimony was corroborated in part by Wesolowski's testimony that he observed Johnson talking to both Wawrzyniakowski and Fischer. (Tr. 130-31.)

On the other hand, Johnson testified that she came out of the house after she observed Reel being patted down, leaving her children (ages twelve, one, and two) upstairs. (Tr. 162-64.) By the time she arrived outside a police officer was also patting down Edwards. (Tr. 164.) Johnson began inquiring of the police what was going on, but no one would respond. (Tr. 164-65.) The police walked Edwards to the police car. (Tr. 165.) When she could not get any answers, Johnson decided to go back inside the house. (*Id.*) At that point, a police officer told her she could not get back inside because a gunman had ran into her house. (*Id.*) Johnson testified that she informed the police that there was no one in her house except for her three children and that she and Edwards were the only adults residing at the house. (*Id.*) The officer asked Johnson if they could go in and check and she said no. (*Id.*) She testified that she told the officer that the children had never seen police officers before and that they would be scared if police officers walked into the house to get them, so

she needed to go get the children. (Tr. 167.) The officer told her that they just needed to check and make sure that there was no one in the house and that she could give them permission to go in or they could get a search warrant. (*Id.*) Johnson testified that she told the officer that he will have to get a search warrant because there was no one in her house except her children. (*Id.*)

Johnson testified that she and this officer went back and forth. (Tr. 168.) The officer told her that there was no way that she could go in the house to get the children and that the police would have to go get them. (*Id.*) Johnson testified that she did not see any reason for the police to go into her house as she knew for a fact that there was no gunman in there. (*Id.*) Johnson testified that despite her protestation, she observed police officers going into her residence. (Tr. 169.)

Johnson's testimony may be corroborated in part by Reel's testimony that Johnson told the officers to get a warrant. (Tr. 235-36.) However, it is unclear whether this portion of Reel's testimony refers to the initial entry or to the later request after contraband was found. Additionally, Johnson testified that she only spoke to an African American officer. (Tr. 170.) Reel testified that they spoke to an Asian or Caucasian officer. (Tr. 232.)

Given the conflicting testimony, I must make a credibility determination between the police officers' version of events and Johnson's. As a finder of fact, the court may accept or reject any or all of a witness' testimony. *See United States v. Berthiaume*, 233 F.3d 1000, 1004 (7th Cir. 2000). All of the witnesses testified adamantly and in detail about their versions of events. But, as with most testimony regarding events that happened months before the witnesses testify to them in court, precisely what actually happened likely lies somewhere in

the middle. However, on balance, after considering the witnesses' demeanor,[1] recollection of the events, any interest the witnesses have in the outcome of the events, the extent to which external evidence contradicts or corroborates the testimony, and the extent to which the testimony rings true in regards to reason and logic, *see United States v. Delzer*, No. 08–CR–138, 2010 WL 1741122, at *1 (W.D. Wis. Jan. 26, 2010), I find that the officers' version that Johnson consented more credible.

As a threshold matter, I find that considering either version of events, there was a tone of urgency surrounding the children being left alone, albeit, perhaps, for different reasons. As to the sense of urgency, all three officers testified that Johnson asked about "my babies" multiple times with a sense of urgency. (Tr. 18, 22-23, 26, 80-81, 120, 130.) By Johnson's own account, she was going back and forth with the police about her need or desire to get back into the house because her children were left alone. (Tr. 168.)

Additionally, under either version, there was also a sense of chaos that day. Regarding the sense of chaos, Fischer testified that he was receiving reports of additional shots being fired in the immediate vicinity so he knew that problems were escalating further with the neighbors. (Tr. 31.) Wawrzyniakowski also testified that "[e]verybody was out. It was a chaotic scene. There was other things that were going on over there. There were shots being fired. I mean everything was happening. It was chaotic." (Tr. 82.) Johnson too described a commotion outside with her neighbors gathering and talking about the shooting. (Tr. 160-61.)

With this setting in mind, I find it more credible that Johnson consented to the entry into her residence, as both Fischer and Wawrzyniakowski testified. (Tr. 22-23, 81.) Fischer's

---

[1] I gave the least weight to demeanor. *See, e.g.*, Hon. James P. Timony, *Demeanor Credibility*, 49 Cath. U. L. Rev. 903 (2000) (discussing the literature on both the usefulness and challenges of demeanor evidence).

testimony that Johnson interrupted his conversation with Edwards to interject her concerns about her children rings consistent with the way Johnson described her own motivation and conduct that day. Prior to the Homicide Detectives arriving on the scene, Fischer was the lead or most senior person on the scene. (Tr. 19.) Fischer testified that "it became obvious to everybody there that [he] was the detective in charge" and that people "were coming up to [him] and telling [him] information" and that he was "directing people," including other officers. (*Id.*) Johnson testified that she just wanted to get back in the house and be with her children. (Tr. 224.) It therefore makes sense that Johnson, who wanted to get back into the house, would have sought Fischer's attention (as the officer in charge), as Fischer testified. Additionally, as indicated earlier, Wesolowski testified that he saw Johnson talking to Fischer and Wawrzyniakowski. (Tr. 130-31.) Although he did not hear the content of the conversation, he corroborates that Johnson talked to those two specifically. (*Id.*) Thus, I do not credit Johnson's testimony that she only spoke to an African American officer about entry into the residence. (Tr. 166, 170.)

Further, Johnson testified that she did not consent because she knew for a fact that there was no gunman in the house. While I find it plausible that Johnson would have taken that position given that she had just come from her house, I do not find it credible that she would have persisted in that position given the officers' expressed concern that a gunman may have entered her residence and that she herself would not be allowed to reenter the residence. Stated differently, given that her children were involved, I believe Johnson's certainty that there was no gunman in her residence would have wavered in the face of the police's insistence that a gunman may have run into her house. This is true even when

weighing Johnson's legitimate concern that police entering the residence would scare the children.

Moreover, considering Johnson's options that day, it rings true that under the circumstances, she would have consented. Johnson testified that the police made it clear that she was not getting back into her residence despite her many requests. She also testified that her motivation that day was to get back to her children, who were inside the residence. Thus, what were Johnson's options? Not being able to get back into her residence, she could either consent or insist that the police get a warrant. If she opted for a warrant, she would remain outside, while the children were inside the residence alone and the police took the steps to go get a warrant. Consider Johnson had not planned to be outside for too long. She had no shoes on and no cell phone. (Tr. 167.) Consider, too, that she would not have known how long the warrant process would take. Additionally, even though the twelve-year-old was with the younger children, at ages one and two, these children were very young. Considering the totality of these factors, I do not find it credible that Johnson, who presented as an intelligent witness and sincere about wanting to get back inside the house with her children, opted to stay apart from them while the police sought a warrant.

Finally, with the version of events so conflicting, I must consider the witnesses' interests in the outcome that may influence their respective testimony. Here, both sides have an interest in the outcome. The police would not want to see the evidence in the case suppressed and perhaps to a lesser extent, their conduct criticized. Johnson, understandably, does not want to see her boyfriend and father of her children prosecuted and possibly convicted and incarcerated. Weighing both sides' interests in this case, I find Johnson's personal interest in the outcome the greater interest that likely influenced her testimony.

Accordingly, this factor also weighs in my finding the officers' version of events more credible. In sum, finding the officers' version of events more credible, I find that Johnson consented to the officers' entry into the residence. I therefore recommend that the court find that the officers' entry into the residence was authorized by Johnson's consent.

### 2.    *Exigent Circumstances Exception*

For completeness, I turn to the government's argument that the entry into the residence was authorized by exigent circumstances. Exigent circumstances arise "when there is a combination of 'a compelling need for official action and no time to secure a warrant.'" *United States v. Escobedo*, 397 Fed. Appx. 205, 208 (7th Cir. 2010) (unpublished) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). Among the recognized exigent circumstances are: when officers must "step in to prevent serious injury and restore order," *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (internal quotations and citation omitted); when "police reasonably believe[d] that their safety, or the safety of the public, may be threatened," *id.*; the police must prevent the imminent destruction of evidence, *Escobedo*, 397 Fed. Appx. at 208; or where the officers are in "hot pursuit" of a fleeing subject, *Kentucky v. King*, 563 U.S. ——, 131 S. Ct. 1849, 1856 (2011). The government bears the burden of showing that the officers reasonably believed that exigent circumstances existed at the time of the warrantless entry. *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994) (internal citation omitted).

Here, the government argues that the officer's entry into the residence can be justified by either safety of the public, hot pursuit, or imminent destruction of evidence. Although the officers' subjective intent is not dispositive, the officers testified that the reason for the entry into the residence was the exigency that existed because of the young children alone in the

residence with a potential assailant, not a hot pursuit of the assailant. Similarly, the officers did not testify of doors being slammed, toilets flushing, or people running that would have lead them to believe that evidence might be destroyed before a warrant could be secured, justifying the imminent destruction of evidence exception. *See United States v. Etchin*, 614 F.3d 726, 734 (7th Cir. 2010). Accordingly, I will focus on the safety of the public exception, specifically the safety of the children.

The government argues that the fact that three young children were alone in the residence with the possibility that the assailant was in the residence amounted to an exigent circumstance justifying the police entry into the residence. Exigent circumstances exist if the officers have an objectively reasonable belief that their safety, or the safety of the public, may be threatened. *Huddleston*, 593 F.3d at 600. When addressing the risk of danger to persons inside of a dwelling, the Seventh Circuit has found that "police need not wait for screams from within in order to fear for the safety of occupants or themselves." *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003); *see also United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995).

There is no dispute that the three children were alone inside the residence. Although there were no cries of distress from the children, their ages and, as discussed earlier, the urgency with which the mother was repeating "my babies," would have grabbed the police's attention. The thrust of Edwards' argument is that it was unreasonable for the police to believe that the shooter was inside the residence and thereby posing a danger to the children. This is a closer call. I agree that no witness told the police that a third person (other than Edwards and Reel) was inside the residence. I also agree that the mere fact that

the shooter was generally at large is not enough for a reasonable officer to specifically believe that the shooter was inside the residence.

However, the issue is not whether the police were certain that the shooter was inside the residence. Rather, the issue is, looking at the facts from the perspective of the officers on the scene, whether there was an objectively reasonable basis for believing that the young children were inside with a possible assailant. On this record, I find such a belief was not baseless.

Recall the reason the police had targeted that house to begin with. The officers were investigating a homicide that had occurred one block away from the residence in question. (Tr. 78-79.) Citizen witnesses told the police that two people were involved in the shooting (one heavier-set and one thinner-set), that these two people ran up the block in the direction of Johnson's house, and that one suspect was wearing red. (Tr. 9-10, 32, 41.) Fischer testified that neighbors were saying that the shooter ran into that house. (Tr. 22.) Edwards and his friend Reel, who matched the description of the two suspects, were observed outside of the Johnson house. Although Fischer knew from viewing the surveillance video that neither Edwards nor Reel was the shooter, he did not eliminate the possibility that they might have been involved. Additionally, Fischer knew that the direction the assailant traveled led to an alley that led to Johnson's residence (Tr. 32.) Moreover, Edwards and Reel lied about being on the crime scene. (Tr. 38.) Given these facts—that Edwards and Reel were suspected to be acting in concert with the shooter;[2] Edwards and Reel lied about being on the scene of the homicide; and that the direction the shooter travelled led to an

<hr />

[2] Neither Edwards nor Reel have been charged in connection with the homicide. To be clear, I speak here of the events on the day of the search from the perspective of the police.

alley that led to Johnson's residence—it was not baseless for the police to theorize that the shooter may have also gone into the house.

Edwards argues that because Johnson, who was just inside her house, told the police that no one other than her children were in the house, the police had no reason to believe that anyone other than the children were in the house. But Edwards disregards that the police had no obligation to believe Johnson. After all, Edwards and Reel, who the police knew from the surveillance video were at the scene at the homicide, lied about being at the scene. And the police knew that Johnson was Edwards' girlfriend and that they had children together. Hence, the police need not have accepted Johnson's statement that no one else was inside the residence.

I also reject Edwards' argument that if the police could enter the Johnson residence, they could have entered any other house on the block as well. This argument also ignores the facts that brought the police to the Johnson residence in the first place. Again, the police had information that two individuals seen at the scene of the homicide had run into that house. Upon arrival at the residence, they were informed that young children were alone in the house. Additionally, the police suspected that the assailant may be inside the residence. These are not random facts that would lead the police to enter any and every house on the block.

In sum, the police officers' belief that an exigency existed was not unreasonable. The belief was reasonably supported by Fischer's observation of Edwards and Reel at the scene of the shooting seconds before the homicide occurred and information received from citizen witnesses and neighbors that Edwards and Reel were involved in the shooting and had entered Johnson's residence. Additionally, although Fischer knew that neither Edwards nor

Reel was the actual shooter, he suspected, based on their presence at the scene of the crime and the reports of citizen witnesses, that they were involved in the shooting, either as material witnesses or accomplices. Further, the shooter was still on the loose and although he appeared on the surveillance video to leave in the opposite direction of Edwards and Reel, his path led to an alley that led to Johnson's residence. This information, coupled with the fact that at least two of Johnson's children were very young (ages one and two) and were potentially alone in the house with a homicide suspect, the officers were justified in entering Johnson's residence based on a potential threat to the children's safety.

## CONCLUSION

Edwards argues for the suppression of evidence found in his residence on the grounds that the officers' entry was illegal because Johnson did not consent to the entry into the residence and there were no exigent circumstances to excuse the officers' warrantless entry. While the officers and Johnson presented diametrically opposing testimony regarding whether Johnson consented to the officers' entry into the residence, for the reasons explained above, I find the officers' version of events more credible and thus find that Johnson consented to entry of the residence. Further, I find that the officers' belief that an exigency existed because three young children were alone in the residence with a possible assailant was not unreasonable. For all of these reasons, I recommend that the defendant's motion to suppress be denied.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress (Docket # 13) be **DENIED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if

applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 6th day of April, 2015.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge